The next case today is Sterling Suffolk Racecourse LLC versus Wynn Resorts, Ltd. at all. Appeal number 20-1512. Attorney Storch, please introduce yourself on the record. Good morning, your honors. May it please the court, Stephen Storch for the appellant Sterling Suffolk Racecourse LLC. And your honor, may I have an additional two minutes in rebuttal? You may have two minute rebuttal. You may not have two additional minutes. I tried to slip one in there. I actually didn't mean to do that. I apologize. Go ahead, please. Your honor, the district court below in finding that there was neither closed-end or open-ended continuity principally relied on this court's case in home orthopedics versus Rodriguez. That case is of an entire different animal than the case that we have before us. In home orthopedics, it was a contract dispute that had a very specific time frame that one party was seeking money from the other. One was seeking not to pay it. And as this court said in that case, once that was resolved, that dispute was over. In this case, this involves not just the acquisition of a license, but also the operation of the casino once that license was obtained. And our complaint specifically alleges that the scheme was not only to obtain the license, but then to operate this casino. I'd like to talk to the enterprise involving Wynn, Massachusetts. Wynn, Massachusetts was controlled by the Wynn defendants. As we laid out in detail in the complaint, the Wynn defendants not only had numerous predicate acts in connection with the application for the license, but also committed serious acts that of other enterprises. And it was that predilection to commit crimes, to commit these kind of predicate acts, which we submit the district court should have taken into consideration in determining whether or not there was a likelihood that the racketeering activity would extend beyond the mere granting of the license. And in fact, there was evidence in the record that that's exactly what happened. The license was granted in September of 2014. Some five years later, the Massachusetts Gaming Commission had to bring Wynn, Massachusetts and the Wynn defendants before it because it was disclosed first in a Wall Street Journal article and then subsequently admitted to by the Wynn defendants that they had engaged in behavior that was at minimum a gross misdemeanor under Nevada law and that they had not revealed that behavior to the Massachusetts Commission, both before they obtained the license and after they became the license operator. And under the Massachusetts Gaming Act, the operator is to maintain their suitability both before and after the license. So what you had in this case was Wynn, Massachusetts that was now operating a gaming casino. It had, as alleged in our complaint, and I'm not even sure that the Wynn people even deny it anymore, had been infiltrated to some extent by the mob, Charles Lightbody in particular. It had allowed the very criminal elements into it that the Massachusetts Gaming Act was supposed to prevent. And the operation, the conduct of Wynn, Massachusetts continued on into 2019. For instance, I just mentioned they did not disclose the fact of the violations of Nevada law. When the Massachusetts Gaming Commission called them in for a hearing, Kim Marie Sinatra refused to testify at the hearing. Mr. Maddox, as the commission noted in its decision, had actually hired a private investigator to tail key witnesses, which the commission noted could have the effect of frightening witnesses as part of its investigation. So the same activity... Mr. Storch? Yes. Was there a point in time when there was a binding lease agreement between your client and Mohegan? No. There was a term sheet, Your Honor, which outlined the terms of the lease agreement. The basic terms had been agreed upon, including the $35 million per annum minimum fee. The parties had both... But there was no binding contract. Well, the contract didn't go into effect until the license was granted. But that was the only place that Mohegan could operate a casino because under the license application, the site of the casino went along with the application. So unless Mohegan's son was going to back out and decide, oh, thanks for the license, but we don't want it, notwithstanding all this effort we've made to get it, that contract would come to fruition. The basic terms had been outlined in a term sheet, including the term of it. Your client is not the license holder, would not have been the license holder in any effect? Correct. Originally, it had been the license holder on its original application. Is there any authority that allows sort of the second party? In other words, somebody could easily bring this, which would be Mohegan's son. They're not. Somebody in privity, would be in privity, I guess, with Mohegan. I thought that creates a problem. Well, being an injured party or showing causation that you're an injured party. I think the difference here is that first, SSR had to apply for suitability. So SSR is not some party that's out there in the dark that the parties don't know about, that somebody who would jump in and say, hey, I was injured by what you did. SSR was listed on the application. SSR had to go through all the suitability. SSR had to disclose its letter of intent with Mohegan's son. SSR was known to not only the commission, but was known to all the defendants. Yes, but Mr. Storch, it's quite clear that foreseeability isn't the test under the statutory causation standards, which require proximate cause as well as but-for cause and does tend to favor the directly injured party and not secondary parties. So what is your response to that? You've made a foreseeability argument, but that doesn't get you very far. Well, Your Honor, I'd submit that SSR was directly damaged. SSR, in its application, laid out what its role was going to be, laid out what the terms of its use were. They can't be harmed unless somebody gets the license and it's not them who gets it. So in that sense, it's indirect. How are you different from the people who were going to provide the furniture? Because the people who were going to provide the furniture didn't have to go through the suitability process, did not have to disclose every aspect of their financial life, and weren't known to the commission. We were an applicant in the sense that we had to apply for suitability. And, Your Honor, Justice Barron, I think the question really goes to this notion of proximate cause as a uniquely factual issue. As we cited in our brief, proximate cause, you need to show that... All I'm saying is that in this case, we know one fact is necessarily true. If Mohegan decided not to seek the license, you would not be injured. That's true. It's derivative of the license being sought by Mohegan. And I'm just trying to think, is there any case in which a derivative pardon has been found to be within the ambit of the statute? I know we had cited such a case in the briefing. Right now, I can't lay my hands on it. I'll try to do it on the rebuttal part. Okay. Go ahead, Judge Thompson. If the commission had decided not to grant either party an application, I mean, a license, would you be injured? No. No. But as the case law on proximate cause indicates, you don't have to rule out every possible way that you could have been injured in another way. For proximate cause, you have to show the plausibility that you were injured as a result of the defendant's actions. And ultimately, it's for the trier of fact to determine whether or not it was more likely that you would have gotten this license if the process had been allowed to proceed. That's why Mohegan would rely on proximate cause analysis, just like you are laying out, and why the fact that they can't prove to a certainty that they would get the license might prevent them from meeting the causation test. But you're a derivative of Mohegan. That's the thing that's unusual. And I just don't know of a case in which somebody who's derivative in that way can satisfy proximate cause. Well, you know, as I said, we have some of those cases in the brief. I will dig them out on the rebuttal. Mr. Storch, if I might. You started by arguing this is not just about the denial of the license to Mohegan. It is also about the continuation of the licensing requirements as to Encore. But once Mohegan is not given the license, how is it you have any possible injury about ongoing licensing requirements for Encore? Well, if Mohegan Sun doesn't get the license, you're right, Bronwyn. Okay, so doesn't that eliminate the leg of your argument about there being a continuing violation beyond the single issue of who gets the license? No, because as we've argued, and I think the evidence certainly at the pleading stage supports this, Mohegan Sun would have gotten the license. When you look at the report that's in the record concerning Mohegan Sun's capabilities and qualifications, Mohegan Sun was clearly... I'm sorry. Okay, you've given me your answer. I don't actually think it makes sense. And don't we have the commission ruling that despite Stephen Wynn's sexual misconduct, they were going to continue the license and they weren't going to get into the question of what they would have done had it been disclosed at the time? Doesn't that also cut off your continuing violation theory? I don't believe so, Your Honor, for the reason that, as the commission said, they were in a different situation at the time of the second hearing. The hotel was already built. They were faced with a casino in the ground. Even then, it wasn't a unanimous decision of the casino. And the only reason they went forward was because they said, well, we have Maddox now in control. The others have left. And even though we're greatly troubled by Maddox, we're going to go forward provided that there's a monitor in place to watch him. And they did that without the knowledge of lies that, as we allege in the complaint... OK. My questions actually do go back to the question of approximate causation, because you've now put two different theories in front of us. And the one, if we reject your notion that you have adequately, for purposes of emotion, to dismiss, pled RICO causation, and there are numerous cases out there deciding this on emotion to dismiss, then your second argument necessarily falls as well. Isn't that correct? Your Honor, the second hearing, I believe, is a situation where the commission is attempting to do the best when it's beginning to hear some of the... No, no, no, no. You're not answering my question. If you have not adequately alleged approximate causation under RICO to survive a motion to about the continuing requirements for ENCOR once it got the license, that necessarily fails as well. Well, if you're going to find as a matter of law that, despite these allegations, that a jury couldn't find that Mohegan would have gotten the license and SSR would have had the lease, then I agree with you, Your Honor. I mean, it goes back to, you know... Can I ask you, before you end, so I understand the theory, putting aside the approximate causation issue, assuming you could satisfy that, maybe just even just imagine it's Mohegan's son for a moment as the plaintiff who is in an even stronger position for approximate causation. On the continuity, if you could just run through it so I make sure I understand it. With respect to open-ended continuity, if I understand what you're saying, the idea is that the activities of this enterprise that are being identified was a way of doing business in which they would have continued to lie to Massachusetts regulators in ways that would have constituted racketeering acts even after they got the license. Is that the sort of it? With a slight nuance, if I may. Okay. All right. I think you don't look at the activities of the enterprise, you look at the activities of the defendants in the way they use the enterprise to commit racketeering acts. And so our argument is you look at the people who are in control of this enterprise and the manner in which they did business. Not just... But the focus has to be that the act would have been open-ended continuity with respect to mass gaming authorities. Otherwise, it's sort of odd that you've got WinMass in there. WinMass doesn't have any interest in doing anything to non-mass gaming authorities. Well, I think in connection with WinMass, you have to have the racketeering acts and that would give basis for a RICO claim. In terms of looking at open-ended continuity... No, no, but I'm trying to figure out... What are the... You're claiming there's a way of doing business by the people through this enterprise. That's right. Okay. You mentioned how they trick people in Macau and they trick people in Las Vegas. One possibility is you're saying they're going to trick the next state that they go to. Another possibility is you're saying that's evidence that they're going to continue to trick Massachusetts going forward. The latter one makes a lot more sense to me than the former. And what we're saying is... Are you saying that? Is it the latter one rather than the former? It's the latter one. Okay, and then with respect to the latter one, could you just help me understand what is the going forward trickery of Massachusetts gaming authorities post-licensure that you have identified? All right. Among post-license, you had, as we allege in the complaint, a 2016 land deal, whereas we allege Wynn needed property and then called down the city of Everett to put pressure on the landowner to sell. We have the situation of Maddox when the sexual harassment was first identified as sending out investigators to tail critical witnesses, which we believe, if not an actual predicate act, is certainly indicative that they are once again resorting to the kind of behavior that was concealed things from the commission prior to the award for license. You have the continued business dealings with illegal entities in Macau, which is indicative that this is still the way they do business, and there's a risk that now that they're in control and operation of this gaming casino in Massachusetts, that they will resort to that. Okay. You have the issue of the mobsters, if I may, contractual reversionary interest in FBT, which had not been disclosed to the commission. Do you plead that under mass law, after the license was given, they would have had to keep making disclosures that would have been false? Yes, we do. Okay, I got it. And then, if we did on the... Could you just walk me through the theory of close-ended continuity and how that works? I take it that we're a little bit... The window of time it took to get this license is a period of time that, under our case law, the shortest isn't the longest. So, could you just help me think through, given how much time did this plan to get the license through racketeering activity under your allegations? Sure. If it was ended continuity.  I'm sorry. I'm sorry. Go ahead. Yeah. On the close-ended continuity, as alleged in the complaint, from the time of the engagement with FBT to the award of the license is approximately, I believe, 21-22 months. I think this court, and I think it was in home orthopedics, talked about a 24-month period as not being a cutoff, but as something that might constitute enough longevity to fold and close-ended continuity. I think, as this court said, also, in its opinion, it's a kind of squishy concept. I think that's the word, actually, that was used. It's a flexible doctrine of continuity. I would submit that over 22 months, that it should not be disqualifying because it doesn't make it to 24 months, but I would also submit that open-endedness also is something to take into consideration when you're looking at the closed-end continuity, which is, is there a threat that this might continue on? There were numerous acts, as we've alleged, in the complaint. Actually, what were in the Gaming Commission's report indicating that there's a threat of continued activity. The only time in the United States gaming business was a fine of this magnitude assessed and a monitor put in to watch over the management of wind. Obviously, the Gaming Commission itself felt that there was a threat that this kind of activity could repeat itself. That in and of itself, I think, is an indication of the possibility of future unlawful acts. In terms of, let me go to one other topic. I don't know if I have time. I didn't hear whether I've gotten a five-minute warning or not. Dan? We're over time at this point, Judge. We'll hear you on rebuttal, Mr. Storch. Thank you. Thank you, Judge. At this time, Mr. Storch, if you could please mute your device. Attorney Biagetti, if you could please unmute your device and introduce yourself back on the record for the court. Yes, if it pleases the court, I am Peter Biagetti for Appellee's Wind Resorts, Wind, Massachusetts and Mathematics. I am presenting with two colleagues, and so with the court's permission, I'm going to unless the court would prefer to start with proximate cause or anything else. It's up to you, counsel, but we do want to hear on both. Thank you. I'll take five minutes on the deficient pattern allegations and really three points that the court pressed Mr. Storch on. The first one is this notion that, as he said, that the defendants, because they allegedly operated other enterprises through crimes, somehow suggest open-ended continuity with regard to the enterprises alleged here. And Judge Saris took that on specifically. She said, with regard to the association in fact enterprise, that disbanded once the Massachusetts, as Judge Barron, you pointed out, that entity and its operation was focused only on the obtaining of the license. Why wouldn't it be focused on keeping the license and operating the casino? Even if it was focused on keeping the license, Your Honor, all that is is at most continuing concealment of the misrepresentations by which the original prize. Why wouldn't it be going forward concealment of new criminal activities of the kind that they did in advance, such as dealing with members of organized crime and securing property to improve the casino, etc.? The idea is there's evidence that, at least at a motion to dismiss stage, would say the way of doing business is sufficiently through racketeering activity that they're going to run this casino in ways that are going to result in misrepresentations to the Gaming Commission going forward and annual reviews, etc. What's wrong with that theory? It's simply the continued cover-up, to use the words of the Perel Art case. No, please. You were asked a specific question. You can't just say continuing cover-up of what happened before. That is not the question before you. Could you answer that, please? I thought the question before me was, why wouldn't subsequent misrepresentation or failure to disclose extend the pattern? The answer is that there is nothing. There are no new predicate acts. The court has to look only at the predicate acts. Not if you think that those past predicate acts are indicative of a way of doing business. The way of doing business would have had to have been respectfully of Wynn, Massachusetts. Yes, but Wynn, Massachusetts' way of doing business is sufficiently criminal, given who's working with them, is the allegation that going forward, we can be pretty sure that there's a high risk that they're going to continue to affiliate with organized crime persons when those new affiliations would be improper under the gaming authorities and that they'll hide them. As long as you could think that, then you would say it's open-ended continuity. The lower court scrutinized those allegations and found, first of all, that those prior acts were not predicate acts. In fact, they're not even pleaded as predicate acts. Therefore, they cannot be considered as evidence of a pattern. The appellant cites to the Conley case and says in Conley, unproven acts were taken into consideration, but that was with regard to continuity of the enterprise, was the enterprise a continuing unit. The cases are clear from HJ to Efron to Giuliano that the court may only focus on the predicate acts themselves. I understand that, but I guess you tell me. In CAD, we just had the New England compounding case. We concluded there was open-ended continuity in that case, if I recall, because the way of doing business of the compounding was sufficiently fraudulent and sufficiently in violation of the various procedures that it was reasonable to assume that the future sales, not just the sales that resulted in the direct injuries, but any future sales would also have been done that way. I think the analogy here as I was reading the brief was, look at how they conducted themselves in misleading the gaming commission to secure the license and look how they run their other operations, people that are associated with this association. In fact, we can be pretty sure that going forward, they're going to engage in problematic activities in operating it and conceal it. That's the way of doing business of the enterprise and the members in the enterprise. What's the problem with open-ended continuity on a motion to dismiss? I guess I don't follow. Two problems, at least, that the lower court found. The first one is that even as to the alleged failure to disclose all those prior bad acts, the commission itself, once those acts came to its attention, said that there had been no violation of the anti-fraud provisions of the Gaming Act by the failure to disclose. Even that is not a predicate act. Secondly, Judge, no relatedness. Remember that Macau allegedly happens. Jay Famiglietti Okay, but maybe I'm missing something. I thought the district court's ruling was based on continuity, that there was not a relatedness problem. Well, the court found relatedness with regard to the four species of predicate acts that it said were adequately pleaded, but when it Jay Famiglietti What I'm saying is, why don't those suggest a way of doing business with respect to how this entity is going to interact with the Gaming Commission that would suggest that they're going to operate it in a way that's going to engage in predicate acts that they'll conceal? I just don't see why that's not a reasonable inference from the pleadings. Jay Famiglietti There's absolutely no allegation that would allow that inference reasonably, Your Honor. The Windmass obtained the license. It was a finite event. There is only one license in this region. There is nothing more for Wind, Massachusetts to obtain. The alleged violations of the Gaming Act end when the license is procured. In the words of, for example, the home orthopedic case, and I disagree with Mr. Storch, I think home orthopedic is spot on. All of the adequately pleaded predicate acts arise out of what home orthopedics calls a single discernible event. Jay Famiglietti Suppose I have the license. Once I have the license, don't I have to make certain disclosures post-licensure with respect to my suitability to continue to operate it? Jay Famiglietti I don't believe that there are subsequent disclosures that are needed, but I would subsequent misrepresentation alleged. It was a subsequent cover-up alleged. What this court approved there was that that subsequent concealment in and of itself does not save a single scheme from a deficient continuity. It's simply the allegedly continued misrepresentation in order to preserve the original. Jay Famiglietti If you could just address the closed-ended continuity and the 22-month point. Jay Famiglietti Sure. The Efron case that this court decided is, I think, dispositive. There you've got 21 months of alleged acts, same as what's alleged here, 17 predicate acts there. Here we have, essentially, even if you include each of the disclosures, the disclosures happened between January and December in one year, 2016. There are four sets of disclosures within 11 months, all directed at a single objective. It's not simply what this court has said in home orthopedics. It's also the Giuliano case and the Efron case. I think the district court had it exactly right, Judge, that there is no closed-ended continuity here because of the single objective, finite accomplishment, nothing more to be accomplished, and really single victim. Even if you decide that the commission is an indirect victim, that alone does not, as the Giuliano court said, using a government agency to facilitate the fraud does not take a narrow single scheme and expand it. Judge Cardone Could you spend a couple of minutes, please, on the causation issue? Jay Famiglietti I'll yield to Mr. Sharpe on that. Thank you. Judge Cardone Okay. Joshua Sharpe Good morning, Your Honors. Joshua Sharpe for Stephen Wynn. May it please the court. Just three quick points on past— Judge Cardone Before you begin, if we could have Mr. Biagetti, please, to mute his device. And I'm sorry, Mr. Sharpe, we can't see you. If you could turn on your camera. Joshua Sharpe Can you see me now? Judge Cardone No, I'm afraid not. Could you turn it on and off? Joshua Sharpe Says camera on, has a green light. Can you see me now? Judge Cardone Yes. Thank you, Judge. Mr. Sharpe, you can go ahead and just start again. Joshua Sharpe Okay. Thank you. Again, Joshua Sharpe for Stephen Wynn. Just three quick points on the predicate acts before we move to causation. One, no properly alleged predicate act is stated to have taken place after the grant of the license. Two, the Giannullo case says a proposed or anticipated fraudulent act cannot be counted as a predicate act in furtherance of a closed-ended racketeering conspiracy. And number three, if you look at the gaming decision, the Gaming Commission decided that— Judge Cardone Before you get to that third point. Joshua Sharpe Yes. Judge Cardone But can a possible predicate act that's anticipated support open-ended continuity? Joshua Sharpe If the predicate acts themselves suggest that open-ended conspiracy would take place. So, yes. Stephen Wynn So, could you just—I mean, I still am not quite sure I understand the reason to think it couldn't here. I take the point you can't use it for closed-ended continuity, but their idea is that you can draw the inference that as they continue to operate the casino as the license holder, they're going to be engaged in a way of doing business that the prior alleged predicate acts suggest will equally be predicate acts. What's wrong with that? Joshua Sharpe Right. That is how you would allege open-ended conspiracy. But the particular acts here are all directed towards getting that license. The complaint itself states that Wynn MA was formed for the purpose of applying for a category one license. The amended complaint states the predicate acts were committed in order to unlawfully acquire the gaming license. If you look at the Gaming Commission's decision, the Gaming Commission actually says that they didn't find any false statements in violation of Massachusetts law on the application. They penalized Wynn Resorts, but it was for something completely unrelated. It was for not following their internal policies, not for violations of the Gaming Act. Now, in terms of proximate causation, the entire case can be dismissed on that basis. Sterling's injury is too indirect and is purely contingent on the harm to Mohegan Sun. If you look at paragraph 156 of the complaint, it says Sterling has been deprived of substantial future revenues it would have received from Mohegan per the terms of its binding contract with Mohegan. And as we just heard from Mr. Storch, I'm not even sure that's correct because I think he said that there was no binding ground lease with Mohegan. Amit Bhandari Did you argue proximate cause below? Joshua Sharpe Yes, we did, Your Honor. And it is in our brief. It's a short section because it doesn't require that much of an explanation, Your Honor. And as Judge Lynch said, there are plenty of cases where approximate cause is dismissed on the 12b-6, Onza v. Ideal Steel and Heming Group v. City of New York. The Supreme Court affirmed such dismissals. The Second Circuit recently did so elsewhere. The difference here, as the Court noted, is that Sterling was not the applicant. Mohegan Sun was the applicant. Amit Bhandari Well, does the fact that they had to undergo a suitability study, does that take it out of the realm? Joshua Sharpe I don't think so, Your Honor. I think that their harm is still collateral. And to the extent they had to go under a suitability study, lots of people have to go under a suitability study. I think that the people who are the card dealers have to get licensed by the casinos. So there's many people that are kind of three levels removed from the initial harm that would have to go under some sort of regulatory scrutiny in order to work at the casino or be vendors to the casino. But we're not saying if you would allow Sterling to sue under RICO as the potential landlord, then really any party that's kind of three levels removed from the harm, like the car dealers, the investment partners, the other vendors could sue under RICO. And with respect to a case or any authority on derivative harm, I think there's two cases that they cite in their brief, the Narantan case and the Bridge case. But these are not actually about derivative harm. In Narantan, Pfizer made misrepresentations about Narantan, and then the physicians ended up prescribing more Narantan, and the insurers paid for it. But in Narantan, the immediate financial victim was the plaintiff insurance company who actually paid the defendant, Pfizer, for the drugs. And the court didn't have to grapple with a more immediate victim because the most immediate victim was the insurance company. So there was also a complicated causal chain, I admit, in the Narantan case because these representations were being made to the doctors. But the immediate financial victim was the insurance company who actually paid for the drugs. And here, the immediate financial victim is Mohegan Sun. Sterling's harm, as with potentially the car dealers or anybody else, was wholly contingent on the direct harm to Mohegan. And then just briefly in terms of the Bridge case, in the Bridge case, the defendant was bidding for a tax lien, and the plaintiff was the competitive bidder for the lien. So, that's all that I had, Your Honors. Thank you. Thank you. Thank you, Mr. Sharp. You can mute your device at this time. Attorney Katz, please introduce yourself on the record. Thank you, Your Honors. Aaron Katz for at Appellee FBT, Everett Realty. Are you able to see me on the camera okay? Yeah.  So, Your Honors, I'd like to begin just by briefly addressing the pattern issue that we have with respect to FBT. Because as I understand the complaint, and as I think the District Court understood the complaint, the enterprise involving my client was restricted to making the false statements to the Gaming Commission on the original license application and in connection with that original license application. And the enterprise essentially terminated after the license was granted to Wynn. Now, the complaint attempts to extend the FBT-Wynn enterprise a little bit by making a conclusory allegation that subsequent to the license being issued, one of the members of FBT attempted to give a bribe to Mayor Carlo De Maria. The District Court rightly concluded that that allegation was far too conclusory to satisfy Rule 9b. I direct the Court to Record Appendix, I think it's 40 and 41 of the Record Appendix, where the allegation is made. First Circuit law is very clear that only allegations that satisfy 9b in a RICO, civil RICO case can be used to establish continuity. The bribery allegations clearly do not. So, what we are left with is FBT, the FBT-Wynn enterprise being closed-ended, no open-ended continuity, limited to 17 to 21 months with a handful of false statements made to a single entity, the Massachusetts Gaming Commission, for a single purpose. I submit there is no way that those allegations survive Efron, Giuliano, home orthopedics in terms of continuity and continuity plus relationship. But I'd also like to emphasize that the Predicate Act allegations that the complaint makes simply extend the RICO statute and the Travel Act beyond what Congress would have intended. The Supreme Court in Cleveland, this Court in Baroa, made clear that false statements made to a state regulatory agency are not the type of conduct that should be within the scope of federal criminal statutes. It is a paradigmatic case where the state regulatory authority has the ability to enforce its own laws. And what the plaintiff attempts to do here is to craft out an exception to that. The first exception under their wire fraud theory is where you have a license that someone is competing over. And the second is where the license is related to a casino. I don't think either work, particularly given that the rule of lenity applies to the interpretation of the RICO statute. On wire fraud, the District Court was correct. Cleveland, the Kelly case in the Supreme Court, clearly foreclosed Sterling Suffolk's wire fraud theory. But on the Travel Act and on the state felony involving gambling, what the District Court essentially did was read the word involving to mean related to or in connection with. And there's simply no precedent for the District Court's broad reading of the RICO statute in that respect. In order to reverse the District Court and send this case back to go to discovery, this necessarily needs to be the first court in the country to hold that lying on a casino license application is an act involving gambling, where the application might never have even been granted to win. That is a radical expansion of federal criminal authority, essentially under the plaintiff's theory. The second, you just combined two different points in one sentence. You said that you'd be the first one to say that lying on an application for a casino gambling license where it wasn't certain that you were going to get the license would be a radical departure. Suppose we took away for a second the likelihood of getting the license and we just focused on lying on the casino application. You think that would be a radical departure to say that it's a RICO problem to apply RICO to an enterprise that is lying about its ties to organized crime to get casino licenses? Well, I think to hold that RICO would apply in that scenario would be to say that in Cleveland, the United States' only mistake was pleading wire fraud as a RICO predicate, as opposed to the Travel Act. The reality is that in any license application, you're going to use interstate commerce, interstate wires, interstate mails. I thought Cleveland was about property. The Travel Act doesn't have a property element. The Travel Act just piggybacks on some other thing, right? That's true, but if you look at Cleveland's animating concern, I think this is true in Baroah as well. I thought its animating concern was construing property. I think it's actually so in Cleveland, the Supreme Court says that Congress needs to speak clearly before we read federal statutes. And the word that wasn't clear there was property. What is unclear here? Is it involving gambling? I think it's the involving. I think that how the district court reads involving basically turns involving into a word as broad as related to. I'm happy to answer any other questions. Otherwise, I think my time is up. Thank you. Thank you, Mr. Katz. You can mute your device at this time. Mr. Storch, you have two minutes of rebuttal. Thank you. Justice Barron, just addressing your question about an approximate cause. In the Supreme Court case of Bridge, it involved fraudulent representations made in connection with purchasing tax liens. And the argument was that the other bidders had been harmed by the defendant's fraudulent practices. One of the arguments made there was, well, how do you know who else would get, would win the bids? And the Supreme Court held that that's not so speculative. The thing about that is that's, again, that's the point about proxy causation as opposed to derivative injury. Your party is derivative of an other party's injury. That's just not an issue in Bridge. Well, the misrepresentation obviously was made to the government entity. I think in this court's decisions, also in the FISA cases, there again, I think, you made that the HMOs... No, I wrote those decisions. It did not involve any derivative injury. It involved direct injury, and then it involved the question of the admissibility of evidence concerning that direct injury. Well, Your Honor, I'm not going to debate you on interpretation of your decision. Good idea. You have another point. But one last thing on this notion of derivative injury. The property of the lease was laid out in the application. The application was a package. Without the property, the application doesn't get granted because if there's no place to put the casino, then you don't get the casino license. These were totally entwined. It's shown in the way the application process proceeded. They had to vet both the property, both SSR... Is there anything in your complaint that suggests that if you being approved as a leaseholder would be of any benefit to you if Mohegan didn't get the license? No, because there needs to be an operator. It's not as if you could be a standing approved leaseholder for some other operator besides Mohegan. You would have to find another operator to put in a new application. And there's no allegation that you had any prospect of doing that in your complaint? We don't allege that in the complaint. Unless your honors have any further questions, I will rest on our papers. Okay. Thank you very much. Thank you, counsel. Counsel, for this case, should leave the meeting at this time.